[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 1, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-10613

_____

D. C. Docket No. 07-21867-CV-JAL

PULIYURUMPIL MATHEW THOMAS,

Plaintiff-Appellant,

versus

CARNIVAL CORPORATION,
d.b.a. Carnival Cruise Lines Inc.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 1, 2009)

Before BARKETT and FAY, Circuit Judges, and TRAGER,* District Judge.

PER CURIAM:

_____

* Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

Puliyurumpil Mathew Thomas appeals the district court's Order granting Carnival Corporation's Motion to Compel Arbitration and the Order denying his Motion to Remand this case to state court. Thomas originally brought suit against Carnival, his former employer which operated cruise lines in Florida waters, in Florida state court for damages arising from injuries he sustained in a slip-and-fall onboard a Carnival ship. He sued for negligence under the Jones Act (Count I),[1] unseaworthiness of the ship and failure to provide prompt and adequate maintenance and cure[2] under general maritime law of the United States (Counts II and III), and failure to pay wages under the Seaman's Wage Act (Count IV).[3]

Relying on the arbitration clause of its most recent Seafarer's Agreement with Thomas in conjunction with the Convention on the Recognition and

---

[1] The Jones Act confers on seamen the statutory right to sue their employers in an American court for the negligence of fellow crew members. 46 U.S.C. § 30104.

[2] "Maintenance and cure" is an ancient common-law maritime remedy for seamen who are injured while in the service of a vessel. Our circuit has described the action as follows:

> The seaman's action for maintenance and cure may be seen as one designed to put the sailor in the same position he would have been had he continued to work: the seaman receives a maintenance remedy, because working seamen normally are housed and fed aboard ship; he recovers payment for medical expenses in the amount necessary to bring him to the maximum cure; and he receives an amount representing his unearned wages for the duration of his voyage or contract period.

Flores v. Carnival Cruise Lines, 47 F.3d 1120, 1127 (11th Cir. 1995).

[3] The Seaman's Wage Act, inter alia, focuses on ensuring prompt wage payment to seaman via a treble-damages wage-penalty provision assessed on employers for late wages. 46 U.S.C. § 10313.

Enforcement of Foreign Arbitral Awards (the "Convention"), Carnival filed to remove the suit to federal court and have the district court compel the parties to arbitrate. The district court granted these motions, finding that the Convention applied and that the arbitration provision of the Seafarer's Agreement was enforceable.

Thomas appeals this decision and argues that it should be reversed on several grounds. First, Thomas argues that the Convention does not apply in this case because two of its four jurisdictional prerequisites have not been met. Specifically, he argues that the requirement that any agreement to arbitrate must be in writing was not met because the governing Seafarer's Agreement at the time of his injuries did not contain an arbitration clause. As to the Convention's provision that it only applies to commercial contracts, he argues that seamen employment contracts are not considered commercial contracts.

Alternatively, Thomas notes that even if all of the jurisdictional requirements are met, the Convention provides that courts need not enforce an arbitration clause when to do so "would be contrary to the public policy of that country." Thomas invokes this affirmative defense, arguing that forcing him to arbitrate in a forum that would apply non-U.S. law constitutes a prospective waiver of his U.S. statutory rights and, thus, the Arbitration Clause violates U.S. public

policy.

Finally, Thomas argues that his statutory claims (based on the Seaman's Wage Act and Jones Act) are outside the scope of the Convention. He asserts that both statutes are at odds with the Convention and, as more recently passed and amended statutes, they supersede all prior inconsistent treaties including the Convention.

## BACKGROUND

Thomas was employed by Carnival as a head waiter on one of its cruise ships, the Imagination, which flew a Panamanian flag of convenience.[4] On November 8, 2004, Thomas slipped and fell on a wet substance in the dining room, dropping a coffeepot. He injured his spine and right shoulder and burned his leg. The Seafarer's Agreement in effect at that time did not contain any arbitration provision (the "Old Agreement"). Thomas received what he alleged was substandard medical care from the onboard physician, who only addressed the leg burn. Due to the injuries, he was signed off the vessel soon after, but on regular vacation time rather than medical leave. During this period, he was not given any

_____

[4] A ship uses a flag of convenience when the nationality of the ship's owner is different from the country of registration of the ship. The ship flies a flag of convenience to show the country of registration, which determines the laws under which the ship is required to operate and to be applied in relevant admiralty cases.

4

maintenance or cure payments, nor was he treated for his neck and shoulder injuries. In January of 2005, Thomas again signed on to the Imagination. Over the course of the next several months, Thomas repeatedly visited the shipboard physician where he claims that he (1) initially was told that he did not have injuries; (2) later was treated only with analgesic balm and pain killers; and (3) eventually was signed off the vessel, again due to injuries and again on regular vacation leave. Before being signed off from the ship, there were many days Thomas could not properly execute his duties because of his shoulder and neck pain, and he consequently lost pay.

On October 10, 2005, Thomas again returned to the Imagination and executed a new Seafarer's Agreement with Carnival that did contain an arbitration clause (the "New Agreement"), which specified that any disputes would be arbitrated in the Philippines and resolved under Panamanian law. Just over two months later, in December of 2005, the shipboard physician determined that Thomas's previous injuries from 2004 rendered him unfit for continuing with his duties, and he was officially discharged for good. Thomas was given a medical sign-off with a $700 payment and commenced receiving medical treatment. After his medical sign-off, he received maintenance and cure payments for approximately three months, but those ceased in April of 2006.

5

**DISCUSSION**

## I. Convention on the Recognition and Enforcement of Foreign Arbitral Awards

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the New York Convention, is a multi-lateral treaty that requires courts of a nation state to give effect to private agreements to arbitrate and to enforce arbitration awards made in other contracting states.[5] The United States, as a signatory to the Convention, enforces this treaty through Chapter 2 of the U.S. Federal Arbitration Act (FAA), which incorporates the terms of the Convention (the "Convention Act").[6]

We review de novo a district court's order to compel arbitration pursuant to the Convention Act. Bautista v. Star Cruises, 396 F.3d 1289, 1294 (11th Cir. 2005). Unless there is an affirmative defense that prevents the application of the Convention Act, the Court should compel the parties to arbitrate, providing the

---

[5] The Convention was adopted by a United Nations diplomatic conference on June 10, 1958 and entered into force on June 7, 1959. It was signed by the President of the United States and ratified by Congress in 1970. As of January 2009, there were 144 parties to the Convention—142 of the 192 United Nations Member States, the Holy See and the Cook Islands (a New Zealand Dependent Territory).

[6] See 9 U.S.C. § 205 ("Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention [on the Recognition and Enforcement of Foreign Arbitral Awards], the defendant or defendants may, at any time before the trial thereof, remove such action or proceeding to the district court . . . where the action or proceeding is pending."); 9 U.S.C. § 206 ("A court having jurisdiction under this chapter [9 USCS §§ 201 et seq.] may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States.")

following jurisdictional prerequisites are met:

(1) there is an agreement in writing to arbitrate the dispute;

(2) the agreement provides for arbitration in the territory of a signatory of the Convention;

(3) the agreement arises out of a legal relationship, whether contractual or not, that is considered commercial; and

(4) one party to the agreement is not a United States citizen, or the commercial relationship at issue has some reasonable relation with a foreign state.

Id. at 1294–95.

There is no dispute that the second and fourth jurisdictional prerequisites of the Convention have been met. Accordingly, we first consider Thomas's argument that the first and third jurisdictional prerequisites have not been met and then consider his affirmative defenses.

## II. Jurisdictional Prerequisites of the Convention

### A. The agreement must arise out of a commercial legal relationship.

Thomas argues that seaman employment contracts are not commercial contracts and therefore are expressly exempt from arbitration under the Convention. However, as Thomas has acknowledged, we have previously held that seaman employment contracts are commercial. Bautista, 396 F.3d at 1295–96. While Thomas submits that this decision was wrong and should be reconsidered,

7

we are bound by our prior precedent.  Accordingly, we find that this jurisdictional requirement is met.

### B. There must be an agreement in writing to arbitrate the dispute.

Thomas also argues that there is no agreement to arbitrate this dispute, in writing or otherwise, because the injuries that gave rise to all of his claims occurred before the New Agreement containing the Arbitration Clause was executed.  In the alternative he argues that, even if some of the claims are subject to the Arbitration Clause, the court erred in ordering arbitration of all his claims, which included those clearly arising out of his first term of employment while his Old Agreement was in effect.  Carnival responds that the Arbitration Clause governs because the suit was brought after the New Agreement was signed. Carnival also suggests that the Arbitration Clause is retroactive.

The Arbitration Clause at issue provides that:

> "Any and all disputes arising out of or in connection with this Agreement, including . . . Seafarer's service on this vessel shall be referred to, and finally resolved by arbitration . . . ."

(emphasis added). The effective date of this provision stated that:

> "[T]he employment relations between [the parties] shall be governed by the terms of this Agreement commencing on the date the Seafarer first signs on board the assigned vessel after signing this Agreement [October 10, 2005] and continuing for a period of time which shall not exceed a maximum service period of 10 months."

8

Thomas brought four claims: (1) Carnival was negligent both in causing the accident resulting in his injuries and its immediate medical response; (2) the vessel was unseaworthy at the time of the accident; (3) he did not receive the amount of maintenance and cure due to him from his injury; (4) he has not received all the wage payments due to him from his employment.

The district court ordered arbitration, noting that "Plaintiff's claims all arise out of his employment on the Imagination" and interpreting the New Agreement to require arbitration of "all disputes arising out of Plaintiff's services on the vessel." We believe the district court erred in this analysis. There is no doubt that Thomas's claims arose out of his employment on the Imagination, but the relevant question is whether they arose "out of or in connection with this [New] Agreement," as set forth in the Arbitration Clause. It is not enough that the dispute simply arose from his work on the Imagination, or arose after the New Agreement was signed, for that matter. The disputes must have some actual relation to the New Agreement, irrespective of what ship the claims originated from and when suit was brought.

As is clear from the face of Thomas's original complaint, his claim of negligence under the Jones Act (Count I) and unseaworthiness (Count II) are allegations that involve only the events stemming from the slip-and-fall in

9

2004—prior to the existence of, and with no connection to, the New Agreement. He could have brought the exact same negligence and unseaworthiness claims had he never executed the New Agreement or signed back on to the Imagination. In fact, had Thomas signed on to any vessel other than the Imagination under an agreement with similar terms as the New Agreement, it would be patently clear that the Arbitration Clause—with its language referring to disputes arising from "this vessel"—would not apply to his negligence and unseaworthiness claims originating from the Imagination.

As to the maintenance and cure claim (Count III), the issue is slightly more complicated. Initially the claim clearly had no connection to the New Agreement because Thomas was owed maintenance and cure from the moment of his injury. However, the fact that he attempted to return to work multiple times, the last attempt of which was governed by the New Agreement, requires further analysis. Specifically, we must address whether his return to work at any point either (1) terminated Carnival's maintenance and cure obligations or (2) created multiple maintenance and cure claims governed by different Seafarer's Agreements. We believe it did neither.

In ascertaining the extent of the coverage of this claim, we have held that the touchstone inquiry to determine if an obligation has been terminated is whether the

10

seaman has recovered to a "pre-accident condition." See Brown v. Aggie & Millie, Inc., 485 F.2d 1293, 1296 (5th Cir. 1973) ("Federal maritime law does not require an injured seaman to forfeit payments of either maintenance or cure if there remains a reasonable possibility that further treatment will aid in restoring him to his pre-accident condition.").[7] We have subsequently explicitly ruled that "the cut-off point for maintenance and cure is not that at which the seaman recovers sufficiently to return to his old job but rather the time of maximum possible cure." Lirette v. K & B Boat Rentals, Inc., 579 F.2d 968, 969 (5th Cir. 1978). From this record, it does not appear that Thomas has reached maximum possible cure. The fact that Thomas (unsuccessfully) attempted to return to work during his employment or signed a new contract has no bearing on his pre-existing maintenance and cure claim arising from his initial injuries; it did not terminate Carnvival's existing obligations nor did it create multiple claims. Accordingly, the maintenance and cure claim does not "arise out of or in connection with the [New] Agreement."

As to the Seaman's Wage Act claim (Count IV), the issue is the closest. This act, inter alia, provides that seamen are entitled to the balance of their wages

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

by the earlier of twenty-four hours after the cargo has been discharged or four days after the seaman himself has been discharged. 46 U.S.C. § 10313(f). Based on the briefs, it is unclear from what period of employment Thomas claims he is owed. If it is for his employment term on the ship before October 10, 2005—which is governed by the Old Agreement—then this also does not "arise out of or in connection with the [New] Agreement." However, to the extent he claims wages for any period of time that occurred after the New Agreement was signed, that aspect of the claim may be covered under arbitration. Unlike the other claims, such a component would fairly be said to be "in connection with" the New Agreement because Thomas would not have been entitled to any further wages but for signing this contract.

Thus, no claim but this last meets the writing requirement of the Convention, unless, as Carnival argues, the arbitration clause is retroactive. However, we find that the New Agreement was not intended to be retroactive such that it supersedes any previous agreements. In contract interpretation, we can glean intent not only from what is said but what is not said. The New Agreement, which was quite thorough, notably did not specify that "disputes arising out of or in connection with this or any previous Agreement, including . . . Seafarer's service on this vessel shall be referred to, and finally resolved by arbitration." We think if the parties

12

had intended retroactivity, they would have explicitly said so.  See, e.g., Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 106 (3d Cir. 2000) ("Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect.").[8]

Reading the contract on its face, as we must, we are required to separate Thomas's claims into those that "arise out of or in connection with the [New] Agreement" and those that do not.  Although it would be more efficient to try all claims together, the Supreme Court has stated that efficiency does not trump resolution in the proper forum:  "[The] Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums."  Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 217 (1985).  The corollary is that a court cannot shoehorn pendent non-arbitrable claims into arbitration based on "its own views of economy and efficiency."  Id.  Because the Jones Act negligence claim, the unseaworthiness claim, the maintenance and cure claim, and part of the Seaman's

_____

[8] The district court, as additional support for its decision, found that the Arbitration Clause was retroactive, citing to a case noting that "an arbitration agreement may be applied retroactively to transactions which occurred prior to execution of the arbitration agreement."  Merrill Lynch, Pierce, Fenner & Smith, Inc. v. King, 804 F. Supp. 1512, 1514 (M.D. Fla. 1992).  However, that case involved an arbitration agreement that "state[d] that it applies to all transactions 'whether entered into prior, on, or subsequent to the date hereof.'"  That is, the agreement in that case explicitly stated it would be retroactive.

13

Wage Act claim (as it pertains to any obligations incurred before October 10, 2005) do not fall under the Convention, they are eligible to be litigated. Accordingly, the district court erred in compelling arbitration as to those claims.

However, a claim for seaman's wages under Thomas's most recent term of employment <u>is</u> covered under the New Agreement. Thus, as to this portion of the claim, we must consider Thomas's affirmative defense under the Convention that the enforcement of the Arbitration Clause should be precluded as a violation of public policy.

## III. Affirmative Defenses Under the Convention

Article V of the Convention provides specific affirmative defenses to a suit that seeks a court to compel arbitration including the following:

> Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country.

Article V (2)(b). Citing to Supreme Court precedent, Thomas argues that the Arbitration Clause, which forces him to resolve any disputes in an arbitral forum that must apply non-U.S. law, effectuates a waiver of his U.S. statutory rights in violation of public policy and, therefore, should not be enforced.[9] Both parties rely

---

[9] Thomas also argues that he is barred from bringing his Jones Act claim, but we need not address this aspect of the argument as we have already held that it does not fall under the Arbitration Clause.

on the two cases from the Supreme Court that discuss the concerns expressed in this particular affirmative defense under the Convention.

In Mitsubishi Motor Corp. v. Soler Chrysler Plymouth, Inc., Mitsubishi, a Japanese car manufacturer, brought suit against its Puerto Rican distributor over a dispute related to their sales agreement and sought enforcement of the agreement's arbitration clause.[10] 473 U.S. 614 (1985). In the counterclaim, the Distributor included a count alleging Sherman Act violations. The Distributor sought to exempt this claim from the reach of the arbitration clause on the grounds that arbitration was not an appropriate forum for antitrust claims and the public interest in the statutory scheme of the Sherman Act would not be vindicated.[11] The court found that enforcing such an agreement in the international context would not violate U.S. public policy because the parties had agreed that American law would, in fact, be applied to the antitrust claims in the Japanese arbitration proceedings. The Court specifically noted that counsel for Mitsubishi conceded at oral argument that American law would apply to the antitrust claims and represented that the

---

[10] The agreement at issue contained a clause providing for arbitration by the Japan Commercial Arbitration Association of all disputes arising out of certain articles of the agreement or for the breach thereof.

[11] For support, the Distributor cited to a Second Circuit case that, in resolving a domestic arbitration dispute, distinguished between contractual and statutory rights and found that Sherman claims could never be arbitrated as they were an important part of the enforcement scheme of antitrust law. American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821 (2nd Cir. 1968).

15

claims had been submitted to the arbitration panel in Japan on that basis.  Id. at 637

n.19.  Thus, U.S. statutory rights, while not being heard by a federal judge, were

nonetheless not being ignored or violated but specifically protected:[12]

> To be sure, the international arbitral tribunal owes no prior allegiance
> to the legal norms of particular states; hence, it has no direct
> obligation to vindicate their statutory dictates.  The tribunal, however,
> is bound to effectuate the intentions of the parties.  Where the parties
> have agreed that the arbitral body is to decide a defined set of claims
> which includes, as in these cases, those arising from the application of
> American antitrust law, the tribunal therefore should be bound to
> decide that dispute in accord with the national law giving rise to the
> claim.  And so long as the prospective litigant effectively may
> vindicate its statutory cause of action in the arbitral forum, the statute
> will continue to serve both its remedial and deterrent function.

Id. at 636–37 (emphasis added).  The Court did, however, note that if "the

choice-of-forum and choice-of-law clauses operated in tandem as a prospective

waiver of a party's right to pursue statutory remedies . . . , we would have little

hesitation in condemning the agreement as against public policy."  Id. at 637 n.19.

The agreement's choice of an arbitrable forum, by itself, is not a cause for

concern.  As the Supreme Court said, statutory rights can be vindicated in

arbitration as well as in court:

> By agreeing to arbitrate a statutory claim, a party does not forgo the
> substantive rights afforded by the statute; it only submits to their

---

[12]  Although the Distributor's claim was based on the Second Circuit's decision in American Safety rather than the affirmative defense provision of the Convention, the concerns relating to vindicating the public interest and policy of the United States are nonetheless similar.

16

resolution in an arbitral, rather than a judicial, forum.  It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration

Mitsubishi, 477 U.S. at 628.

The important question, however, is choice of law: What law will apply in that arbitral forum?  As noted, in Mitsubishi, the party seeking to compel arbitration conceded that U.S. law would apply in the arbitration of the antitrust claims there.  In this case, however, there is no such assurance in either the New Agreement or the representations of Carnival's counsel that U.S. law will apply. On the contrary, the New Agreement explicitly states that Panamanian law will apply.

The Supreme Court revisited the question of whether an international arbitration clause could violate U.S. public policy in Vimar Seguros Y Reaseguros v. M/V Sky Reefer, which involved a dispute between a New York fruit distributor and a Japanese carrier.  515 U.S. 528 (1995).  The Distributor had purchased oranges from a foreign supplier and contracted with the Carrier to transport them to the United States by cargo ship.  The fruit arrived with significant damage and the Distributor sued the Carrier to recover its losses. The Carrier moved to stay the action and to compel arbitration in Japan pursuant to the arbitration clause in the

17

bill of lading in conjunction with the enforcement provisions of the FAA.[13]  The

Distributor argued that the arbitration clause was unenforceable under the FAA

because, inter alia, it would violate the Carriage of Goods by Sea Act

(COGSA)[14]—the U.S. enactment of the Hague Rules—and to compel arbitration

would violate U.S. public policy.  Specifically, it claimed that the foreign

arbitrators would apply the Japanese enactment of the Hague Rules, which would

significantly lessen the Carrier's liability in violation of "the central guarantee" of

COGSA.  Id. at 539.  The Court noted that, "The relevant question, therefore, is

whether the substantive law to be applied will reduce the carrier's obligations to

the cargo owner below what COGSA guarantees."  Id.  It then held,

> Whatever the merits of petitioner's comparative reading of COGSA

---

[13] A bill of lading is document issued by a carrier to a shipper, acknowledging that specified goods have been received on board as cargo for conveyance to a named place for delivery to the consignee who is usually identified.  The form bill of lading at issue contained a clause which provided that (1) the contract evidenced by or contained in the bill of lading was governed by Japanese law, and (2) any dispute arising from the bill of lading was to be referred to arbitration in Tokyo, Japan, by the Tokyo Maritime Arbitration Commission.

[14] COGSA is a U.S. statute governing the rights and responsibilities between shippers of cargo and ship operators regarding ocean shipments to and from the United States. It is the U.S. enactment of the International Convention Regarding Bills of Lading, commonly known as the "Hague Rules."  Congress, concerned that the Hague Rules did not offer shippers enough protection against damage to cargo by shipowners, amended the Hague Rules to increase the protection to cargo owners.
    The central guarantee of § 3(8) of COGSA is that the terms of a bill of lading may not relieve the carrier of the obligations or diminish the legal duties specified by the Act.  Namely, any clause in a contract of carriage relieving or lessening the liability the liability of a carrier or ship for loss or damages arising from negligence, fault, or failure in the duties or obligations provided in § 3 is null and void and of no effect.

and its Japanese counterpart, its claim is premature. At this interlocutory stage <u>it is not established what law the arbitrators will apply to petitioner's claims</u> or that petitioner will receive diminished protection as a result. The arbitrators may conclude that COGSA applies of its own force or that Japanese law does not apply so that, under another clause of the bill of lading, COGSA controls.

<u>Id.</u> at 540.[15] The Court again noted, however, that "[w]ere there no subsequent opportunity for review and were we persuaded that 'the choice-of-forum and choice-of-law clauses operated in tandem as a <u>prospective waiver</u> of a party's right to pursue <u>statutory remedies</u> . . . , we would have little hesitation in condemning the agreement as against public policy.'" <u>Id.</u> (quoting <u>Mitsubishi</u>, 473 U.S. at 637 n.19).

<u>Vimar</u> presented a slightly different scenario than <u>Mitsubishi</u>. In the latter there was no doubt that American law would apply; in <u>Vimar</u>, although at the time of the appeal, it was unknown which country's laws would govern, it was possible that U.S. law might apply, and given that the proceedings were at an interlocutory stage, there would be another opportunity to review the case once the plaintiff sought enforcement of the award. In the case before us, however, it is undisputed that, regardless of the procedural posture of the case, U.S. law will never be

---

[15] The Supreme Court reaffirmed <u>Vimar's</u> emphasis on the procedural posture of the arbitration dispute in <u>PacifiCare Health Systems v. Book</u> when it upheld arbitration of a claim because, as in <u>Vimar</u>, it was "'mere speculation' that an arbitrator might interpret these ambiguous agreements in a manner that casts their enforceability into doubt." 538 U.S. 401, 407 (2003) (citing <u>Vimar</u>, 515 U.S. at 541).

applied in resolving the resolution of Thomas's claims.

The Court, then, has held that arbitration clauses should be upheld if it is evident that either U.S. law definitely will be applied or if, there is a possibility that it might apply <u>and</u> there will be later review. The arbitration clauses that provided the bases for these holdings are in direct contradistinction to the Arbitration Clause in the present case, which specifies ex ante that <u>only</u> foreign law would apply in arbitration. There is no uncertainty as to the governing law in these proposed arbitral proceedings—only Panamanian law will be applied. The New Agreement provides:

> This Agreement shall be governed by, and all disputes arising under or in connection with this Agreement or Seafarer's service on the vessel <u>shall be resolved in accordance with, the laws of the flag of the vessel on which Seafarer is assigned at the time the cause of action accrues, without regard to principles of conflicts of laws thereunder</u>. The parties agree to this governing law, notwithstanding any claims for negligence, unseaworthiness, maintenance, cure, failure to provide prompt, proper and adequate medical care, wages, personal injury, or property damage which might be available under the laws of any other jurisdiction.

There is no dispute that the Imagination's flag of convenience is Panamanian nor that Thomas's Seaman's Wage Act claim is a U.S. statutory remedy. Thus, under the terms of the Arbitration Clause, Thomas must arbitrate in the Philippines (choice-of-forum) under the law of Panama (choice-of-law). As the arbitrator is bound to effectuate the intent of the parties irrespective of any public policy

20

considerations, these arbitration requirements have "operated in tandem" to completely bar Thomas from relying on any U.S. statutorily-created causes of action. This inability to bring a Seaman's Wage Act claim certainly qualifies as a "prospective waiver" of rights, including one of a private litigant's "chief tools" of statutory enforcement—the Act's treble-damages wage penalty provision for late payments, see, e.g., Mitsubishi, 473 U.S. at 635 ("The treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators.").[16]

Moreover, there is no assurance of an "opportunity for review" of Thomas's Seaman's Wage Act claim. Although we are at an interlocutory stage, the possibility of any later opportunity presupposes that arbitration will produce some award which the plaintiff can seek to enforce. But, in accordance with our holdings above, in this case Thomas would only be arbitrating a single issue—the

---

[16] While the Supreme Court has not been confronted with an arbitration clause that would act as a prospective waiver, lower federal courts applying Vimar have. See Central National-Gottesman, Inc. v. M.V. "Gertrude Oldendorff", 204 F. Supp. 2d 675, 679 (S.D.N.Y. 2002) ("The court is persuaded that the forum selection clause at issue here essentially operates as a prospective waiver of Gottesman's right to pursue statutory remedies under COGSA. If the case were decided in London instead of this district, there is a strong likelihood that English courts would give force to an exculpatory clause in the bill of lading, insulating parties other than the shipowner from liability, in violation of COGSA."); Nippon Fire & Marine Ins. Co. v. M/V Spring Wave, 92 F. Supp. 2d 574, 575 (E.D. La. 2000) ("[T]he Court finds that the [foreign forum selection] clause is unreasonable under the circumstances by violating the strong public policy against limiting liability in contravention of Section 1303(8) of COGSA."). But cf. Fireman's Fund Ins. Co. v. Cho Yang Shipping Co., 131 F.3d 1336, 1340 (9th Cir. 1997) (compelling arbitration after finding "uncontroverted evidence that Korean law will be at least as favorable [to plaintiff] as COGSA").

Seaman's Wage Act claim, one derived solely from a U.S. statutory scheme. If, applying Panamanian law, Thomas receives no award in the arbitral forum—a distinct possibility given the U.S. based nature of his claim—he will have nothing to enforce in U.S. courts, which will be deprived of any later opportunity to review.

Despite our general deference to arbitration agreements in an era of international trade expansion, see id. at 638–39, the possibility of such a result would counsel against being deferential in this circumstance, as it is exactly the sort that the Supreme Court has described as a "prospective waiver of parties' rights to pursue statutory remedies" without the assurance of a "subsequent opportunity for review." Vimar, 515 U.S. at 540. The Court explicitly stated that in such situations it "would have little hesitation in condemning the agreement as against public policy." Id. For the reasons expressed, we find the Arbitration Clause requiring arbitration in the Philippines under Panamanian law null and void as it relates to Thomas's Seaman's Wage Act Claim.[17]

---

[17] Thomas also argued that the Seaman's Wage Act was categorically not subject to the Convention but rather was removed from its reach pursuant to U.S. Bank v. Arguelles, 400 U.S. 351 (1971) (holding that the Labor Management Relations Act (LMRA) did not abrogate the Seaman's Wage Act remedy). In Lobo v. Celebrity Cruises, Inc.,we concluded otherwise and held that the Convention Act superseded the Seaman's Wage Act. 488 F.3d 891 (11th Cir. 2007) (noting that Arguelles was decided just after the Convention Act was passed such that the Court likely did not have the opportunity to consider the Convention, and finding that, unlike in the legislative history of the LMRA, it was clear that Congress did not intend to allow for broad industry-specific exceptions to the Convention Act).

Our opinion has no bearing on the holding of Lobo. We note that in Lobo the arbitration agreement stated the arbitral forum would be either Miami, FL or the seafarer's country of

## IV. Conclusion

We reverse the district court's decision to compel arbitration as to all of Thomas's claims, as discussed above, and remand for further proceedings in accordance herewith.

**REVERSED** and **REMANDED**

---

citizenship and did not specify that only foreign law would apply. More to the point, our decision today does <u>not</u> find that the Seaman's Wage Act supercedes the Convention Act or bars recognition of the Arbitration Clause. Rather, the narrow holding is that the Convention <u>does govern</u> but, applying its affirmative defenses provision, we find that <u>the particular arbitration clause in question</u> is null and void as a matter of public policy.

23