BARKETT, Circuit Judge,
dissenting:
In 1985, the Supreme Court issued Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444, a landmark opinion upholding an international commercial agreement requiring U.S. statutory antitrust claims to be arbitrated abroad. The Court emphasized that its decision to uphold the agreement turned on the fact that American law would apply in the arbitral proceeding, thus ensuring the vindication of U.S. statutory remedies. Mitsubishi, 473 U.S. at 636-38 & n. 19, 105 S.Ct. 3346. Indeed, in footnote 19, the Court cautioned in the most forceful language that “in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party’s right to pursue statutory remedies ..., we would have little hesitation in condemning the agreement as against public policy.” Id. at 637 n. 19, 105 S.Ct. 3346.
Tracking that language, Lindo argues in this case that the arbitration agreement in his employment contract — requiring that he submit his federal Jones Act claim of negligence to arbitration in Nicaragua under Bahamian law — effectuates a prospective waiver of his statutory rights and therefore violates public policy. The majority holds, however, that Lindo must first proceed to arbitration before raising *1288 this argument because public policy is not a defense to arbitration under the New York Convention (“Convention”),[1] the treaty governing international arbitration agreements and awards. I dissent because I do not believe that Lindo must needlessly wait until after arbitration to raise his public policy argument; rather, I believe that the New York Convention, its implementing legislation, and Supreme Court precedent authorize him to raise this argument up front, before proceeding to arbitration. This view finds additional support in the understanding of the political branches and prominent scholars at the time of the Convention’s ratification. I also believe, contrary to dicta in the majority opinion, that the arbitration agreement in this case effectuates precisely the sort of prospective statutory waiver that the Supreme Court has said it “would have little hesitation in condemning ... as against public policy.” Id. Although these two views formed the basis of our decision in Thomas v. Carnival Corp., 573 F.3d 1113 (11th Cir.2009), I take this opportunity to expound on them.
I.
As the majority observes, there are two stages of judicial enforcement under the New York Convention: the initial pre-arbitration stage, where a court determines whether to refer a matter to arbitration (“agreement-enforcement stage”); and the subsequent post-arbitration stage, where a court determines whether to enforce a resulting arbitral award (“award-enforcement stage”). With respect to the agreement-enforcement stage, Article 11(3) of the Convention requires a court to refer certain matters to arbitration, “unless it finds that the [arbitration] agreement is null and void, inoperative or incapable of being performed.” Convention, art. 11(3). The threshold issue here is whether an arbitration agreement can be rendered “null and void, inoperative or incapable of being performed” on account of its inconsistency with the forum nation’s public policy. If so, Lindo would be permitted to raise his prospective waiver argument at the initial agreement-enforcement stage.
As an initial matter, the meaning of the phrase “null and void” strongly suggests that public policy is a defense to arbitration. See Medellin v. Texas, 552 U.S. 491, 506, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (“The interpretation of a treaty, like the interpretation of a statute, begins with its text.”). It is well-established that agreements contrary to public policy are characterized in our legal system as “void.” See, e.g., Oubre v. Entergy Operations, Inc., 522 U.S. 422, 431, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998) (Breyer, J., concurring) (defining “void” as something “without any legal effect, say, like a contract the terms of which themselves are contrary to public policy”); Evans v. Jeff D., 475 U.S. 717, 759, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986) (Brennan, J., dissenting) (referring to the “well-established principle that an agreement which is contrary to public policy is void and unenforceable”). Indeed, Black’s Law Dictionary provides that “[a] contract is void ab initio if it seriously offends law or public policy....” Black’s Law Dictionary 1709 (9th ed. 2009) (emphasis added). This common understanding — that a contractual provision contrary to public policy is void — must inform the meaning of the Convention’s “null and void” clause.
This view is strengthened by Article V(2)(b) of the Convention, which provides that a court need not enforce an arbitral award if such enforcement would be contrary to public policy. Although one might initially wonder whether the Convention’s *1289 express inclusion of a public policy exception at the award-enforcement stage implies a deliberate omission of such an exception at the agreement-enforcement stage, any such implication is dispelled by the proceedings of the New York Conference. See Medellin, 552 U.S. at 507, 128 S.Ct. 1346 (considering “the negotiation and drafting history of [a] treaty”). In fact, the drafters of the Convention proceeded under the assumption that arbitration agreements would be addressed later in a separate Protocol, and thus they were chiefly concerned with the enforcement of arbitral awards, not agreements to arbitrate. Albert Jan van den Berg, The New York Convention of 1958: Towards a Uniform Judicial Interpretation 9, 56 (1981). It was “[n]ot until the final days of the Conference” that it was “realized that such a separation could seriously hamper the effectiveness of the new Convention.” Id. at 9. Article II was consequently “drafted in a race against time,” id. at 56, and it was inserted “in the closing days of negotiations.”[2] Gary B. Born, International Commercial Arbitration: Commentary and Materials 159 (2d ed. 2001). As a result, and despite its importance, “[ljittle thought, and less drafting attention, was given” to Article II, id., and the drafting history does “not reveal any discussion regarding th[e] words” of the “null and void” clause. Van den Berg, supra, at 154. It would therefore be a mistake to assume that the express inclusion of a public policy exception in Article V(2)(b) implies that such an exception is not encompassed by Article 11(3), which was deliberately left broad. See id. at 155 (observing that the “null and void” clause “appear[s] to encompass a broad range of reasons for which an arbitration agreement can be invalid”).
To the contrary, it makes good sense to look to Article V(2)(b)’s public policy exception when interpreting Article II(3)’s “null and void” clause. Indeed, we did so in Thomas,[3] Interpreting the Convention this way makes sense because it congruously links the two stages of enforcement. For example, the First Circuit has observed that failing to so interpret the Convention would require a court to compel arbitration in a dispute involving the sale of slaves, despite knowing full well that any resulting arbitral award would be unenforceable as a matter of public policy. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc., 723 F.2d 155, 164 n. 9 (1st Cir.1983), aff'd in part, rev’d in part, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). While this example may be extreme, it illustrates the absurdity and inefficiency of requiring a court to refer a matter to arbitration where it is apparent from the face of the agreement that any subsequent award would be unenforceable as a matter of public policy.
Indeed, the two most authoritative scholarly sources interpreting the Convention around the time of its adoption — both of which have been relied on by the Supreme Court — have taken this view. First, G.W. Haight, a member of the International Chamber of Commerce delegation to the New York Conference, contemporaneously prepared what remains the most comprehensive summary of the proeeed *1290 ings. G.W. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference (May/June 1958). Despite his own delegation’s preference for arbitration, Haight expressed the view that “courts may under [the ‘null and void’ clause] be allowed some latitude; they may find an [arbitration] agreement [to trigger this clause] if it offends the law or the public policy of the forum.” Id. at 28.
Second, a seminal law review article published in the Yale Law Journal shortly after the Convention entered into force reached the same conclusion: “Article [V(2)(b) ] allows the forum State to refuse enforcement of an award if the recognition and enforcement of the award would be contrary to its public policy. It can be expected that the forum State will similarly refuse ... to order the parties to arbitration where its public policy renders the arbitral agreement ‘null and void, inoperative or incapable of being performed.’ ” Leonard V. Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049,1064 n. 71 (1961).[4]
Significantly, this interpretation of the “null and void” clause is also that of the political branches in the United States. When submitting the Convention to the Senate for ratification in 1968, President Johnson attached a memorandum prepared by the Department of State, adopting Quigley’s view that the “null and void” clause incorporated Article V(2)’s exceptions to the enforcement of arbitral awards. S. Exec. Doc. E, 90th Cong, 2d Sess. 19 (1968) (“Paragraph 3 [of Article II] ... provides] that a court in a contracting country, when seized of an action in respect of which the parties have made an agreement within the meaning of Article II, shall, upon the request of one of the parties, refer the parties to arbitration unless it finds the agreement null and void, inoperative, or incapable of being performed. Here again, it appears that the exceptions provided in Article V, paragraph 2, with respect to the enforcement of awards, would apply.”). And, in this respect, the State Department anticipated that Article V(2)(b)’s public policy exception “would give the courts to which application is made considerable latitude in refusing enforcement.” Id. at 21. I find it highly significant that the political branches ratified the Convention with the apparent understanding that the enforcement of international arbitration agreements would not come at the expense of all other U.S. public policies.[5] See Abbott v. Abbott, 560 U.S.-,-, 130 S.Ct. 1983, 1993, 176 L.Ed.2d 789 (2010) (“It is well settled that the Executive Branch’s interpretation of a treaty is entitled to great weight.”) (quotation marks and citation omitted). *1291 Contrary to the majority’s suggestion, neither Scherk v. Alberto-Culver, 417 U.S. 506, 94 S.Ct. 2449 (1974) nor Mitsubishi rejected this understanding of the Convention. See Maj. op. at 1283. Indeed, the Court in Scherk specifically declined to “reach[ ] the issue of whether the Convention ... would require of its own force that the agreement to arbitrate be enforced in the present case----” 417 U.S. at 520 n. 15, 94 S.Ct. 2449. And it is telling that the majority in Scherk did not dispute the dissent’s assertion that Article 11(3) includes public policy as a defense to arbitration. Id. at 530 & n. 10, 534, 94 S.Ct. 2449 (Douglas, J., dissenting). Nor did the Court reject this proposition in Mitsubishi. To the contrary, the clear implication of footnote 19 is that a public policy defense can be raised at the agreement-enforcement stage. See Mitsubishi, 473 U.S. at 637 n. 19, 105 S.Ct. 3346 (“[I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party’s right to pursue statutory remedies ..., we would have little hesitation in condemning the agreement [not the award] as against public policy.”) (emphasis added).
The Supreme Court confirmed in Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) that a public policy defense based on the prospective waiver doctrine may sometimes be raised at the agreement-enforcement stage. In that case, the Court upheld an international agreement requiring a U.S. statutory claim to be arbitrated abroad under foreign law. Id. at 541, 115 S.Ct. 2322. Although the petitioner argued at the initial stage that this agreement effectuated a prospective statutory waiver, the Supreme Court found this argument “premature.” Id. at 540, 115 S.Ct. 2322. Significantly, however, the Court repeatedly emphasized that its decision turned on the critical fact that the district court had retained jurisdiction over the case, thus guaranteeing that the petitioner would have a subsequent opportunity to raise his public policy defense at the award-enforcement stage. Id. at 532, 540-41, 115 S.Ct. 2322; see id. at 542, 115 S.Ct. 2322 (O’Connor, J., concurring in the judgment) (reiterating that the majority’s holding turned on the district court’s retention of jurisdiction). And the Court made clear that “[w]ere there no [such] subsequent opportunity for review” at the award-enforcement stage, “and were we persuaded that ‘the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party’s rights to pursue statutory remedies, we would have little hesitation in condemning the agreement as against public policy.’ ” Id. at 540, 115 S.Ct. 2322 (quoting Mitsubishi, 473 U.S. at 637 n. 19, 105 S.Ct. 3346) (ellipsis omitted). Thus, Vimar supports the proposition that a public policy defense based on the prospective waiver doctrine may be raised at the initial agreement-enforcement stage when there will not be any subsequent opportunity for review.
In this case, Lindo’s prospective waiver argument is not premature because the district court did not retain jurisdiction. Instead, the court issued a final order compelling arbitration, dismissing Lindo’s complaint, and closing the case. Thus, unlike in Vimar, there is no guarantee that Lindo will be afforded an opportunity to raise his prospective waiver argument at the award-enforcement stage.[6] As a re- *1292 suit, he may raise it at the initial agreement-enforcement stage.[7]
Notwithstanding all of the authority discussed above, the majority reads our decision in Bautista v. Star Cruises, 396 F.3d 1289 (11th Cir.2005), in a manner that precludes Lindo from raising his public policy defense at the agreement-enforcement stage. In that case, this Court stated (without analysis) that the “Convention’s null and void clause ‘must be interpreted to encompass only those [breach of contract defenses] — such as fraud, mistake, duress, and waiver — that can be applied neutrally on an international scale.’ ” Id. at 1302 (quoting DiMercurio v. Sphere Drake Ins. PLC, 202 F.3d 71, 79 (1st Cir.2000)); see Bautista, 396 F.3d at 1302 (“Domestic defenses to arbitration are transferrable to a Convention Act case only if they fit within th[is] limited scope of defenses.... ”). The majority asserts that, by so limiting the scope of the “null and void” clause, Bautista effectively eliminated national public policy as a defense.
However, construing Bautista this way, as the majority does, places it in conflict with Supreme Court precedent. Precluding a public policy defense from ever being raised at the agreement-enforcement stage conflicts with VimaPs holding that such a defense may be raised at that stage when there is no subsequent opportunity for review. Although Vimar did not specifically discuss the “null and void” clause, that
clause is the only authority upon which the Court’s holding could have been based. See Brubaker & Daly, supra note 3, at 1273 (“[T]he null and void clause provides the only possible basis under the New York Convention for courts to apply the prospective waiver doctrine and refuse to compel parties to arbitrate.”).
Moreover, by suggesting that only certain domestic defenses to arbitration apply in the international context, the majority’s reading of Bautista overlooks a key provision of the legislation implementing the Convention. That legislation, codified as Chapter 2 of the Federal Arbitration Act (“FAA”), contains a residual clause providing that Chapter 1 of the FAA, governing arbitration generally, “applies to actions and proceedings brought under [Chapter 2] to the extent that [Chapter 1] is not in conflict with [Chapter 2] or the Convention as ratified by the United States.” 9 U.S.C. § 208. Chapter 1, in turn, provides that arbitration agreements are enforceable “save upon such grounds as exist at law or in equity for the revocation of any contract.” 9 U.S.C. § 2. As discussed above, public policy constitutes such a ground. And because there is nothing in Chapter 2 or the Convention that excludes public policy as a defense to international arbitration, see 9 U.S.C. § 206; Convention, art. 11(3), the residual clause operates to ensure its inclusion.
*1293 Finally, exacerbating the conflict between the majority’s reading of Bautista and all of the above authority is that Bautista is devoid of any reasoning or analysis. In limiting the scope of the “null and void” clause to defenses that are capable of neutral international application, Bautista simply quotes the First Circuit’s decision in DiMercurio as if this was a settled proposition of law. DiMercurio, however, traces back to Ledee v. Ceramiche Ragno, 684 F.2d 184, 187 (1st Cir.1982) and I.T.A.D. Assocs., Inc. v. Podar Bros., 636 F.2d 75, 77 (4th Cir.1981), two decisions that pre-date both Mitsubishi and Vimar. Even at that time, the First and Fourth Circuit’s interpretation of the “null and void” clause was hardly gospel. See Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazoni v. Lauro, 712 F.2d 50, 53 (3d Cir.1983) (approving Ledee and I.T.A.D., but concluding that an agreement may also be rendered “ ‘null and void’ ... when it contravenes fundamental policies of the forum state”) (citation omitted). And this is for good reason. Those decisions provided only a cursory analysis of the Convention and simply relied on the following dicta in Scherk: “[T]he goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed ... in the signatory countries.” 417 U.S. at 520 n. 15, 94 S.Ct. 2449. This rather generic statement of purpose is reflected in the strong presumption in favor of enforcement. But it hardly signifies that, by ratifying the Convention, the United States sought to require courts to enforce arbitration agreements that contravene a strong U.S. public policy. Indeed, it is telling that this dicta in Scherk is supported by a citation to the State Department’s ratification memorandum and Leonard Quigley’s Yale Law Journal article, see id., two sources that, as discussed above, conclude that Article II(3)’s “null and void” clause includes a public policy exception to arbitration.
In effectively excluding public policy from the scope of the “null and void” clause, the majority’s reading of Bautista wholly fails to account for the text of the clause, Article V(2)(b) of the Convention, the residual clause in the Convention’s implementing legislation, and contrary views held by the political branches at ratification, prominent scholars, and even the Supreme Court itself. Based on the great weight of this authority, I believe that the “null and void” clause encompasses a public policy defense that may be raised at the initial agreement-enforcement stage.
II.
Although the majority holds that Lindo may not raise his public policy defense at this initial stage, it gratuitously goes on to assert that the arbitration agreement does not violate public policy. Maj. op. at 1283— 86. Needless to say, this discussion is wholly unnecessary to the majority’s resolution of this case and is plainly dicta. See, e.g., Schwab v. Crosby, 451 F.3d 1308, 1327 (11th Cir.2006) (“[Tjhat which is not necessary to the decision of a case is dicta.”). Nonetheless, I write to explain my contrary view that a faithful application of the Supreme Court’s prospective waiver doctrine compels the conclusion that the arbitration agreement in this case contravenes public policy.
As explained at the outset, the Supreme Court articulated the prospective waiver doctrine in Mitsubishi in order to ensure the preservation of federal statutory rights in foreign arbitral proceedings. The Court repeatedly emphasized this point in footnote 19 and the surrounding text. See Mitsubishi, 473 U.S. at 637 n. 19, 105 S.Ct. *1294 3346 (stressing the litigant’s “right to pursue statutory remedies” in the arbitral proceeding); id. at 637, 105 S.Ct. 3346 (stressing the litigant’s ability to “effectively ... vindicate its statutory cause of action in the arbitral forum”); id. at 638, 105 S.Ct. 3346 (suggesting that the foreign arbitral proceeding must “ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed”); id. (suggesting that the arbitral proceeding must take “cognizance of the antitrust claims and actually decide[ ] them”). And the Court’s decision to uphold the agreement in that case turned on the very fact that American law, not foreign law, would apply in the arbitral proceeding. See id. at 636-38 & n. 19, 105 S.Ct. 3346.
The majority asserts that footnote 19 of Mitsubishi is “undisputably dicta.” Maj. op. at 1278. This cannot be the case, as this footnote was critical to the Court’s reasoning and the outcome of the case. Merely because the Court did not find a prospective waiver there does not make that language — forming part of the Court’s core reasoning — dicta. Indeed, it is revealing in this respect that the Supreme Court has reaffirmed the prospective waiver doctrine twice since Mitsubishi, and has done so as recently as 2009. See 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, -, 129 S.Ct. 1456, 1474, 173 L.Ed.2d 398 (2009) (“[A] substantive waiver of federally protected civil rights will not be upheld ....”) (citing Mitsubishi, 473 U.S. at 637 & n. 19, 105 S.Ct. 3346); Vimar, 515 U.S. at 540, 115 S.Ct. 2322 (quoting with approval the prospective waiver language in Mitsubishi, 473 U.S. at 637 n. 19, 105 S.Ct. 3346). And this Court has previously characterized footnote 19 of Mitsubishi not as dicta, but rather as controlling precedent that needed to be distinguished. See Lipcon v. Underwriters at Lloyd’s, London, 148 F.3d 1285, 1293-94, 1298-99 (11th Cir.1998).[8]
Moreover, discounting the Supreme Court’s prospective waiver doctrine has serious implications. In doing so, the majority effectively transforms the enforcement of international arbitration agreements into the top U.S. public policy. As discussed above, there is nothing to suggest that the political branches ever intended such a result. And the prospective waiver doctrine operates to avoid that result by ensuring that the enforcement of such agreements will not be elevated over every other U.S. public policy — including policies dating back to the very founding of this country. Lindo’s case exemplifies this point.
From the earliest days of the Republic, there has been a “great public policy of preserving [seamen as an] important class of citizens for the commercial service and maritime defence of the nation.” Harden v. Gordon, 11 F.Cas. 480, 483 (No. 6,047) (C.C.D.Me.1823) (No. 6,047) (Story, J.). Indeed, “[s]eamen have always been regarded as wards of the admiralty, and their rights, wrongs, and injuries a special subject of the admiralty jurisdiction. The policy of Congress, as evidenced by its legislation, has been to deal with them as a favored class.” Bainbridge v. Merchants’ & Miners’ Transp. Co., 287 U.S. 278, 282, 53 S.Ct. 159, 77 L.Ed. 302 (1932) (citation omitted). Consequently, seamen like Lin-do have traditionally been afforded special legal remedies. See McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 354, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991).
*1295 Among the special remedies afforded to seamen is the Jones Act, which provides a statutory cause of action in negligence to any “seaman injured in the course of employment.” 46 U.S.C. § 30104. Congress enacted this statute to “provide liberal recovery” for seamen, Kernan v. Am. Dredging Co., 355 U.S. 426, 432, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958), in order to assuage their hazardous “exposure to the perils of the sea.” Chandris, Inc. v. Latsis, 515 U.S. 347, 354, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995) (citation and quotation marks omitted); accord Crimson Yachts v. Betty Lyn II Motor Yacht, 603 F.3d 864, 874 n. 5 (11th Cir.), cert. denied, — U.S.-, 131 S.Ct. 178, 178 L.Ed.2d 41 (2010). See also David W. Robertson, A New Approach to Determining Seaman Status, 64 Tex. L.Rev. 79, 80 (1985) (explaining that the “perils of the sea ... include the full range of dangers associated with deep water, wind and weather, tides and currents, ocean predators, great distances from shore, relative isolation, and inaccessibility of shore-side facilities for aid and succor”).
To achieve that purpose, the Jones Act affords seamen “heightened legal protections,” Chandris, 515 U.S. at 354, 115 S.Ct. 2172, including the right to “recover ... with a lower showing of proximate cause than would be required in a non-admiralty case.” Dempsey v. Mac Towing, Inc., 876 F.2d 1538, 1542 (11th Cir.1989). Rather than showing, for example, that the employer’s negligence was a substantial factor in causing the injury, “causation may be found [under the Jones Act] if the defendant’s acts or omissions played any part, no matter [h]ow small, in bringing about the injury.” McClow v. Warrior & Gulf Navigation Co., 842 F.2d 1250, 1251 (11th Cir.1988) (citation omitted). This so-called “featherweight” causation standard, id. (citation omitted), dramatically increases the likelihood of recovery, thus reflecting the strong public policy deeply embedded in our nation’s history.
Enforcing the arbitration agreement in this case directly contravenes that public policy. The agreement unambiguously requires Lindo to submit his Jones Act claim to arbitration under Bahamian law. But there is no Jones Act in the Bahamas. Instead of a relaxed or featherweight causation standard, Bahamian law requires a seaman to prove a direct causal link between the employer’s negligence and the injury, a much more stringent standard. The result is that the arbitral tribunal will neither “take cognizance of the statutory cause of action” nor “actually decide” a claim under the Jones Act, making the prospect of recovery substantially more difficult and unlikely. Mitsubishi, 473 U.S. at 637-38 & n. 19, 105 S.Ct. 3346. In short, the agreement results in the evisceration, not the vindication, of Lindo’s statutory right under the Jones Act to establish causation by a mere featherweight.[9]
We employed this same reasoning in Thomas. In that case, we considered a contractual provision requiring a cruise-ship employee to arbitrate his statutory claim under the Seaman’s Wage Act in the Philippines under Panamanian law. Thomas, 573 F.3d at 1115-20 & n. 9. Like the Jones Act, the Seaman’s Wage Act affords seamen special legal remedies, namely the right to obtain treble damages for late wage payments. See Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 572, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) *1296 (“[T]he evident purpose of the statute is to secure prompt payment of seamen’s wages and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed.”) (ellipsis, quotation marks, and citation omitted). We noted the importance of this right in Thomas, 573 F.3d at 1115 n. 3, for it constitutes the very mechanism by which Congress sought to enforce the statute’s purpose. See Griffin, 458 U.S. at 572, 102 S.Ct. 3245 (explaining that “Congress has chosen to secure [the statute’s] purpose through the use of potentially punitive sanctions designed to deter negligent or arbitrary delays in payment”). Because we implicitly found that Panamanian law did not authorize treble damages for late wage payments,[10] we held that the arbitration agreement effectuated a prospective waiver of Thomas’s statutory rights under the Seaman’s Wage Act, in violation of the same general public policy at issue in this case. See id. at 1123-24.
Although Thomas is almost directly on point and closely follows the Supreme Court’s prospective waiver doctrine, the majority here relies heavily on our decision in Lipcon. In that non-arbitration case, this Court enforced an international agreement requiring U.S. statutory securities claims to be resolved in English courts under English law. Applying M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)— which established the framework for evaluating international forum-selection clauses — we concluded, inter alia, that these choice clauses did not violate public policy because, even though English law was “less favorable” to the American plaintiffs than U.S. securities laws, it provided “adequate remedies” allowing the “polic[ies] underlying United States securities law [to] be vindicated.... ” See Lipcon, 148 F.3d at 1297-99.
The majority reads Lipcon far too broadly. It suggests that Lipcon stands for the sweeping proposition that an international agreement does not violate public policy merely because the applicable foreign law is less favorable than U.S. law. Such a broad reading, however, would place Lipcon in direct conflict with the Supreme Court’s prospective waiver doctrine. In order to reconcile Lipcon with that doctrine, it is necessary to emphasize instead Lipcon’s finding that English remedies, despite being less favorable, nonetheless allowed for the “vindication]” of the policies underlying the federal securities law. Id. at 1299. Unsurprisingly, that finding was tied to the particular facts and circumstances of the case, see id. at 1297-99 (relying on the particular claims, defendants, and provisions of English law), thus yielding a narrow holding with limited prospective applicability.
The upshot is that, contrary to the majority’s assertion, Thomas does not conflict with Lipcon, and Lipcon does not control this case. For one thing, Lipcon did not even involve an arbitration agreement, much less the New York Convention. Moreover, Thomas and this case involve fundamentally different facts and circumstances than Lipcon — different federal statutes, different public policy considerations, and different choice clauses.[11] *1297 Thus, Lipcon’s narrow, fact-specific public-policy holding hardly precluded a contrary result in Thomas or this case, where the foreign law to be applied would wholly vitiate — not vindicate — a critical statutory right and contravene a strong and deeply-rooted U.S. public policy.
Finally, it bears mention that Lipcon itself did not meaningfully distinguish the Supreme Court’s prospective waiver doctrine. The Court in Lipcon first suggested that the prospective waiver doctrine was not applicable because Mitsubishi involved antitrust claims, not securities claims. Id. at 1294. Of course, Mitsubishi’s articulation of the doctrine did not turn on the fact that antitrust claims were at issue; the Supreme Court’s subsequent reiteration of the doctrine in Vimar — involving claims brought under the Carriage of Goods by Sea Act, a completely different federal statute — should have made that clear. Lipcon, however, did not cite Vimar, decided only three years earlier.
The Court in Lipcon also relied on Mitsubishi’s statement that “concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes” counsel in favor of enforcing international arbitration agreements. Id. (quoting Mitsubishi, 473 U.S. at 629, 105 S.Ct. 3346). Again, these policy concerns admittedly account for the presumption in favor of enforcement. But that presumption is overcome by the Supreme Court’s accompanying articulation of the prospective waiver doctrine.
In sum, I believe the Supreme Court meant what it said in Mitsubishi. The majority, however, gives the Supreme Court’s prospective waiver doctrine short shrift. I would simply take the Supreme Court at its word, as we are required to do, and apply the doctrine to the case before us. And such an application compels the conclusion that the arbitration agreement in Lindo’s contract effectuates precisely the sort of prospective statutory waiver that the Supreme Court “would have little hesitation in condemning as against public policy.” Mitsubishi, 473 U.S. at 637 n. 19, 105 S.Ct. 3346. Accordingly, I would hold that the arbitration agreement in Lindo’s contract is “null and void” and thus unenforceable.

. Hence the treaty’s tide — Convention on the Recognition and Enforcement of Foreign Arbitral Awards — and its conspicuous failure to reference arbitration agreements.

. While we cited only Article V(2)(b), we held at the initial stage of enforcement that the agreement was "null and void” on public policy grounds. Thomas, 573 F.3d at 1120— 24 & n. 17; see Joseph R. Brubaker & Michael P. Daly, Twenty-Five Years of the “Prospective Waiver” Doctrine in International Dispute Resolution: Mitsubishi’s Footnote Nineteen Comes to Life in the Eleventh Circuit, 64 U. Miami L.Rev. 1233, 1257 (2010) (observing that, despite Thomas's citation to Article V(2)(b), "Article 11(3) ... appears to have influenced the court’s decision”).

. Other commentators have expressed this view as well. See, e.g., Robert J. Barry, Application of the Public Policy Exception to the Enforcement of Foreign Arbitral Awards Under the New York Convention: A Modest Proposal, 51 Temp. L.Q. 832, 836 n. 16 (1978) (“Article II of the New York Convention, relating to the obligation of a court to refer parties to arbitration unless it finds that the said agreement is null and void, is, in effect, a public policy exception to the obligation of the courts of a contracting state to refer the parties to arbitration.”) (quotation marks omitted); Comment, Greater Certainty in International Transactions Through Choice of Forum?, 69 Am. J. Int’l L. 366, 371 (1975) (stating that the Convention "permit[s] the courts of one state to refuse to enforce an agreement to arbitrate which is void because [it is] contrary to the public policy of that state”).

. Nothing in the text or legislative history of the Convention's implementing legislation suggests a contrary congressional understanding. See 9 U.S.C. § 206; S.Rep. No. 91-702 (1970); H. Rep. No. 91-1181, 1970 U.S.C.C.A.N. 3601 (1970).

. The majority counters that Lindo could bring a separate action following arbitration under 9 U.S.C. § 207. But, unlike Chapter 1 of the Federal Arbitration Act, § 207 only authorizes an action to "confirm" an arbitral award. Cf. 9 U.S.C. §§ 10-11 (authorizing motions to "vacate," "modify,” and "correct” an arbitral award). Thus, it is by no means clear that Lindo could rely on § 207 to attack (rather than confirm) an adverse arbitral *1292 award at the award-enforcement stage. Moreover, under the majority’s logic, there would always be a subsequent opportunity for review, even though the statement in Vimar— which did not even mention § 207 — plainly contemplated cases in which there would not such an opportunity. This is such a case.

. Further bolstering this Supreme Court precedent is case law from England, which is "entitled to considerable weight” given that nation’s status as a fellow signatory to the Convention. Abbott, 560 U.S. at -, 130 S.Ct. at 1993 (quotation marks and citation omitted); see Accentuate Ltd. v. Asigra Inc., [2009] Q.B. ¶¶ 72, 87-89 (Eng.) ("Where an arbitration clause purports to apply a foreign law which does not give effect to a mandatory provision of EU law, then the agreement to arbitrate is void.... [T]his court [must] give effect to the mandatory provisions of EU law, notwithstanding any expression to the contrary on the part of contracting parties.... Accordingly, the arbitration clause would be 'null and void’ and 'inoperative'

. Even if such a forceful and recurring doctrine could be considered dicta, our precedent prohibits us from “lightly cast[ing] [it] aside.” Schwab, 451 F.3d at 1325-26 (citation omitted); McDonald’s Corp. v. Robertson, 147 F.3d 1301, 1315 (11th Cir.1998); Peterson v. BMI Refractories, 124 F.3d 1386, 1392 n. 4 (11th Cir.1997).

. The majority speculates that Lindo may ultimately prevail under Bahamian law. That unlikely possibility, however, does not lessen the agreement’s evisceration of the statutory right, which is not a right of recovery, but rather a right to establish causation under a featherweight standard. Moreover, the majority’s speculation is troubling in this case because, as explained above, there is no guarantee that Lindo will be afforded a subsequent opportunity for review at the award-enforcement stage.

. Although Thomas did not specifically discuss Panamanian law, the clear implication from our decision was that it did not authorize treble damages for late wage payments.

. For example, contrary to this case and Thomas, the choice clauses in Lipcon called for the dispute to be resolved in, and under the laws of, England, a well-known and developed judicial system. See Brubaker & Daly, supra note 3, at 1247 (''[M]any U.S. courts often [conduct the Bremen ] analysis in a deferential manner if the forum-selection clause calls for litigation in the courts of a well-known or developed judicial system.”).