[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11793
_____

D.C. Docket No. 0:14-cv-60174-RSR

JORGE ESCOBAR,

Plaintiff-Appellant,

versus

CELEBRATION CRUISE OPERATOR, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 25, 2015)

Before HULL and DUBINA, Circuit Judges, and BOWEN,[*] District Judge.

HULL, Circuit Judge:

This appeal concerns the enforceability of the arbitration agreement in

plaintiff Jorge Escobar's employment contract with his former employer, the

_____

[*]Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District
of Georgia, sitting by designation.

defendant Celebration Cruise Operator, Inc. ("Celebration").  Escobar appeals the district court's order (1) granting Celebration's motion to compel arbitration of Escobar's Jones Act claims and (2) denying Escobar's motion to remand his case to state court.  After a review of the record and the parties' briefs, and with the benefit of oral argument, we conclude the district court properly enforced Escobar's arbitration agreement.

## I. BACKGROUND

Plaintiff Jorge Escobar ("Escobar") was a crew member of the "M/V Bahamas Celebration" (the "Bahamas Celebration"), a cruise ship owned and operated by the defendant Celebration.  The Bahamas Celebration was registered and flagged in the Bahamas.

While Escobar is a citizen of Honduras, the Defendant Celebration is incorporated in the Bahamas and has its principal place of business in Fort Lauderdale, Florida.

### A.    Escobar's Employment Contract

On April 27, 2011, Escobar executed an employment contract with Celebration that required arbitration of all claims "arising out of or in connection with" Escobar's employment.  The contract provided that any arbitration would be heard by a single arbitrator.

2

Escobar's contract also provided that the "agreement is to be governed by the laws of the vessel's flag state, currently the Bahamas." The contract stated that "[a]lthough [Celebration] shall bear the initial cost of the arbitration, each [party] shall be responsible for one half of the cost of arbitration."[1]

In August 2011, Escobar was injured while working onboard the Bahamas Celebration. He filed suit in Florida state court against Celebration, asserting Jones Act[2] claims for negligence, unseaworthiness, failure to provide maintenance and cure, and failure to treat.

## B.    Motion to Compel Arbitration

Celebration removed the action to federal district court, pursuant to 9 U.S.C. § 205, and filed a motion to compel arbitration and dismiss the complaint.

Escobar opposed Celebration's motion. First, Escobar argued that the arbitration agreement in his contract is void as against public policy because it provided that Bahamian law governed. Escobar argued this foreign choice-of-law clause violates public policy because it prospectively waived his right to pursue statutory remedies under American law.

Second, Escobar contended that the arbitration clause is void because its cost-splitting provision "makes the costs of arbitration prohibitive and effectively

---

[1]Pursuant to the contract's severance clause, the parties agreed (1) to sever any term or condition found to be invalid, illegal or unenforceable, and (2) that the contract and the remaining terms would remain in full force and effect.

[2]See 46 U.S.C. § 30104.

3

precludes the Plaintiff from bringing such claims." Although the arbitration clause explicitly stated that Celebration—not Escobar—"shall bear the initial cost of the arbitration," Escobar argued that his half of the ultimate arbitration fees would be $20,000 for a three-day arbitration hearing. In a later affidavit, Escobar declared that he was unemployed, had $0 in his bank account, and did not have any money to pay for arbitration. Escobar never identified how he calculated the $20,000 figure or when he would be expected to pay his half-share.

Third, Escobar argued that the Federal Arbitration Act (the "FAA") excludes from its coverage employment contracts of seamen.

Escobar also filed a motion to remand the case to state court. Escobar argued that his Jones Act claims could not be removed to federal court as a matter of law.

In a thorough, 18-page order, the district court (1) granted Celebration's motion to compel arbitration, (2) denied Escobar's motion to remand, and (3) dismissed the complaint. The district court addressed each of Escobar's arguments in detail and explained why they failed. The district court reviewed the FAA, the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), the Convention Act (which implements the New York Convention), and our precedent—all of which we also review below.

4

Escobar timely appealed.

## II. STANDARD OF REVIEW

We review de novo a district court's order compelling arbitration. See Bautista v. Star Cruises, 396 F.3d 1289, 1294 (11th Cir. 2005). Likewise, we review de novo a district court's denial of a motion to remand a state-court action because it implicates subject-matter jurisdiction. Bailey v. Janssen Pharmaceutica, Inc., 536 F.3d 1202, 1204 (11th Cir. 2008).

## III. THE FAA AND THE NEW YORK CONVENTION

Two chapters of Title 9 to the United States Code are relevant to this appeal: (1) Chapter 1, which contains the FAA, 9 U.S.C. §§ 1–16, and (2) Chapter 2, which contains the Convention Act, 9 U.S.C. §§ 201–208.[3] We review these laws as necessary background.

Congress enacted the FAA to combat widespread hostility to arbitration. American Express Co. v. Italian Colors Restaurant, 570 U.S. ___, ___ 133 S. Ct. 2304, 2308–09 (2013). The FAA "reflects the overarching principle that arbitration is a matter of contract." Id. at ___, 133 S. Ct. at 2309.

The Convention Act implements the New York Convention. See 9 U.S.C. § 201; see also New York Convention, art. II(3) and III, June 10, 1958, 21 U.S.T.

---

[3]This opinion uses "the FAA" to refer to 9 U.S.C. §§ 1–16 and "the Convention Act" to refer to 9 U.S.C. §§ 201–208. Although courts often refer to the entirety of Title 9 as the Federal Arbitration Act, this Court has differentiated between Chapter 1 and Chapter 2 because the terms of the two chapters call for such differentiation. See Bautista, 396 F.3d at 1292 n.2.

5

2517 (Dec. 29, 1970).[4]  The Convention Act provides that the New York Convention "shall be enforced in United States courts in accordance with this chapter."  9 U.S.C. § 201.

In turn, the New York Convention provides that the United States "shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration."  New York Convention, art. II(1).

The New York Convention generally requires the courts of signatory nations to give effect to private arbitration agreements and to enforce arbitral awards made in other signatory nations.  New York Convention, art. II(3) and III.  Both the Bahamas and the United States are signatories to the New York Convention.  See Lindo v. NCL (Bahamas), Ltd., 652 F.3d 1257, 1262 (11th Cir. 2011).

## IV. THE FAA'S EXEMPTION DOES NOT APPLY TO NEW YORK CONVENTION CASES

As a threshold issue, Escobar argues that his claims cannot be arbitrated at all because, as a seaman, he is exempt from the FAA altogether.  As Escobar notes,

---

[4]The New York Convention opened for signature on June 10, 1958, and the United States became a signatory effective December 29, 1970.

6

the FAA provides that it does not apply to "contracts of employment of seamen." 9 U.S.C. § 1.

On the other hand, as Celebration points out, the Convention Act provides that any arbitration agreement "arising out of a legal relationship" that "is considered as commercial . . . falls under the [New York] Convention." Id. § 202. And the Convention Act further specifies that the FAA—Chapter 1 of Title 9— "applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States." Id. § 208 (emphasis added).

In Bautista, this Court explained at length why the FAA's seamen's exemption in 9 U.S.C. § 1 is in conflict with the broad scope of the New York Convention and does not apply to arbitration agreements that fall under the New York Convention. See 396 F.3d at 1296–99. First, this Court in Bautista explained that the Convention Act's definition of "commercial" transactions in 9 U.S.C. § 202 is not limited to only those transactions that are considered commercial and governed by the FAA. See id. at 1297–98. Rather, § 202's definition of "commercial" includes "contracts evidencing a commercial transaction," as defined by the FAA, "as well as similar agreements." Id. at 1298. Accordingly, the Convention Act includes a "broad and generic" definition of "commercial" transactions, which includes seamen's contracts. See id. at 1299.

7

Second, the <u>Bautista</u> Court explained that applying the FAA's seamen's exemption would conflict with this broad definition of "commercial" transactions in the Convention Act. <u>Id.</u> This Court in <u>Bautista</u> thus concluded that the FAA's seamen's exemption does not apply residually to cases governed by the Convention Act because the FAA applies to such cases only "<u>to the extent that [the FAA] is not in conflict</u>" with the Convention Act or the New York Convention. <u>Id.</u> (quoting 9 U.S.C. § 208).

In sum, this Court held that "[t]he statutory framework of [the FAA] and the language and context of the Convention Act preclude the application of the FAA seamen's exemption, either directly as an integral part of the Convention Act or residually as a non-conflicting provision of the FAA." <u>Id.</u> In reaching this holding, the <u>Bautista</u> Court followed the Fifth Circuit's decision in <u>Freudensprung v. Offshore Technical Servs., Inc.</u>, 379 F.3d 327, 339 (5th Cir. 2004) ("When the Convention Act governs the recognition and enforcement of an arbitration agreement or award, . . . the FAA applies only to the extent that the FAA is not in conflict with the Convention Act or the Convention as ratified by the United States." (quotation marks omitted and alteration adopted)).

Since our <u>Bautista</u> and the Fifth Circuit's <u>Freudensprung</u>, the Fourth and Ninth Circuits have reached the same conclusion that the FAA's seamen's exemption does not apply to cases, like Escobar's, governed by the Convention

8

Act.  See Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 370 (4th Cir. 2012)

(holding that "the [9 U.S.C.] § 1 exemption does not apply" to a case governed by

the Convention Act); Rogers v. Royal Caribbean Cruise Line, 547 F.3d 1148,

1154–55 (9th Cir. 2008) (holding that the FAA's seamen's exemption does not

apply to cases governed by the Convention Act).[5]

Accordingly, we conclude that the district court properly applied the

Convention Act, which implements the New York Convention, to Escobar's

claims.[6]  See Bautista, 396 F.3d at 1296–99.  Having determined that the New

York Convention, not the FAA exemption, applies, we now examine whether

Escobar's arbitration agreement is enforceable under the New York Convention.

## V. ESCOBAR'S ARBITRATION AGREEMENT

In determining whether to compel arbitration under the Convention Act, a

district court conducts "a very limited inquiry."  Id. at 1294 (quotation marks

omitted).  An arbitration agreement is governed by the New York Convention if

the following four jurisdictional requirements are met: (1) the agreement is "in

writing within the meaning of the [New York] Convention"; (2) "the agreement

---

[5]The Third Circuit reached the same conclusion in an unpublished opinion.  See Razo v. Nordic Empress Shipping Ltd., 362 F. App'x 243, 245–46 (3d Cir. 2009) (unpublished).

[6]Escobar argues that we are not bound to follow Bautista because Bautista itself failed to follow existing Eleventh Circuit and Supreme Court precedent.  In support of this argument, Escobar cites to cases applying the FAA's seamen's exemption to contracts, but none of these cited cases involve arbitration agreements governed by the New York Convention.  Accordingly, we reject Escobar's argument that Bautista is not good law.

provides for arbitration in the territory of a signatory of the [New York] Convention"; (3) "the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial"; and (4) one of the parties to the agreement is not an American citizen. Id. at 1295 n.7; see also Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 449 (3d Cir. 2003). If the arbitration agreement satisfies those four jurisdictional prerequisites, the district court must order arbitration unless one of the New York Convention's affirmative defenses applies. Bautista, 396 F.3d at 1294–95.

Further, a district court "must be 'mindful that the Convention Act generally establishes a strong presumption in favor of arbitration of international commercial disputes.'" Lindo, 652 F.3d at 1272 (quoting Bautista, 396 F.3d at 1294–95 (quotation marks omitted)). A district court cannot refuse to enforce international arbitration clauses merely because "a different resolution would be reached in a purely domestic setting." Id. (citing Bautista, 396 F.3d at 1302). Indeed, "under the [New York] Convention and Supreme Court and Circuit precedent, there is a strong presumption in favor of freely-negotiated contractual choice-of-law and forum-selection provisions, and this presumption applies with special force in the field of international commerce." Id. at 1275 (collecting cases).

It is undisputed that the four jurisdictional requirements are met. Escobar's arbitration agreement is in writing, arises out of a commercial relationship, and

10

provides for arbitration in the Bahamas, a signatory nation; and Escobar is not an American citizen.  This case is primarily about whether Escobar has an affirmative defense to the enforcement of his arbitration agreement.  To evaluate that issue, we review the two stages of enforcement.

## VI. TWO STAGES OF ENFORCEMENT

To implement the New York Convention, the Convention Act provides two causes of action in federal court for a party seeking to enforce arbitration agreements covered by the New York Convention: (1) an action to compel arbitration in accord with the terms of the agreement, 9 U.S.C. § 206, and (2) at a later stage, an action to confirm an arbitral award made pursuant to an arbitration agreement, 9 U.S.C. § 207.  See Lindo, 652 F.3d at 1262–63.

These two stages of enforcement are known as (1) the arbitration-enforcement stage and (2) the award-enforcement stage.  See id. at 1263 (contrasting "the initial arbitration-enforcement stage" from "the award-enforcement stage").  Only certain defenses can be raised at each stage of enforcement, and the available defenses differ between the arbitration-enforcement stage and the award-enforcement stage.  See id. at 1281.

### A.    Article II Defenses at Arbitration-Enforcement Stage

Article II of the New York Convention applies at the initial arbitration-enforcement stage.  Id. at 1263 (citing Bautista, 396 F.3d at 1301).  Under Article

11

II, the only affirmative defense to arbitration is a defense that demonstrates the arbitration agreement is "null and void, inoperative or incapable of being performed." New York Convention, art. II(3).[7]

The null-and-void clause encompasses only those defenses grounded in standard breach-of-contract defenses—such as fraud, mistake, duress, and waiver—that can be applied neutrally before international tribunals. See Bautista, 396 F.3d at 1302; see also Lindo, 652 F.3d at 1272–73 (discussing Bautista).

For example, an unconscionability defense cannot be raised at the arbitration-enforcement stage. See Lindo, 652 F.3d at 1276–80; Bautista, 396 F.3d at 1301–03. Although an unconscionability defense can be styled as a claim that the arbitration agreement is "null and void," see Bautista, 396 F.3d at 1301–02, such a defense is unavailable under Article II at the arbitration-enforcement stage because it cannot be applied neutrally before international tribunals, see id. at 1302 ("It is doubtful that there exists a precise, universal definition of the unequal bargaining power defense that may be applied effectively across the range of

_____

[7]Article II contains the "null and void" defense, which—like 9 U.S.C. § 206—is directed at courts considering an action or motion to "refer the parties to arbitration":

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

New York Convention, art. II(3) (emphasis added); see also Lindo, 652 F.3d at 1263.

12

countries that are parties to the [New York] Convention, and absent any indication to the contrary, we decline to formulate one.").

Importantly, Article II contains no explicit or implicit public-policy defense at the initial arbitration-enforcement stage.  See Lindo, 652 F.3d at 1263 (citing New York Convention, art. II); accord Aggarao, 675 F.3d at 373 (holding that a plaintiff was not entitled to raise a public-policy defense "until the second stage of the arbitration-related court proceedings—the award-enforcement stage").  Rather, as we explain below, Article V expressly recognizes public-policy defenses as appropriate at the award-enforcement stage.

## B.    Article V Defenses at Award-Enforcement Stage

After the arbitration is completed and an award is issued, Article V of the New York Convention applies at the award-enforcement stage.  See New York Convention, art. V; see also Lindo, 652 F.3d at 1263, 1280.  Article V enumerates seven defenses that—like 9 U.S.C. § 207—are directed at courts considering whether to recognize and enforce an arbitral award.  See New York Convention, art. V (listing seven instances where "[r]ecognition and enforcement of the award may be refused" by "the competent authority where the recognition and enforcement is sought"); Lindo, 652 F.3d at 1263 (noting that Article V "enumerates seven defenses"); see also 9 U.S.C. § 207 (providing "[t]he court shall

13

confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention").

One of Article V's seven defenses is the "public policy" defense, which states:

> Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country.

New York Convention, art. V(2) (emphasis added). Because "Article V applies only at the arbitral award-enforcement stage and not at the arbitration-enforcement stage," Lindo, 652 F.3d at 1280, such public-policy arguments cannot be raised at the arbitration-enforcement stage, see id. at 1280–82. Parties must instead wait until the award-enforcement stage to assert an Article V public-policy claim. See id.; cf. Bautista, 396 F.3d at 1301–02 (concluding that affirmative defense of unconscionability cannot be raised at arbitration-enforcement stage).[8]

With this overview, we return to Escobar's claims.

## VII. CHOICE-OF-LAW CLAUSE

As an affirmative defense, Escobar contends that the arbitration clause in his employment contract is unenforceable because that clause requires his claims to be governed by Bahamian law. Specifically, Escobar asserts that: (1) Bahamian law

---

[8]This Court's precedents discussing the differences between Article II and Article V uniformly support the proposition that only Article II defenses are available at the arbitration-enforcement stage, while Article V defenses are available only at the award-enforcement stage accords. See Lindo, 652 F.3d at 1281.

14

does not afford the same rights and remedies as American law, (2) this choice-of-law clause results in a prospective waiver of his right to pursue statutory remedies under American law, and thus (3) his arbitration agreement violates public policy and should not be enforced.  Escobar's public-policy claim is based on what is called the "effective-vindication doctrine."[9]

In response, Celebration argues that, at this arbitration-enforcement stage, Escobar may not raise his foreign choice-of-law defense because it is a public-policy defense and not one of the traditional contract defenses applicable at this stage.  Instead, Celebration contends, Escobar must wait until the award-enforcement stage before raising this argument.

## A.    Escobar's Public-Policy Defense is Premature at this Arbitration-Enforcement Stage

Unfortunately for Escobar, a challenge based on public policy cannot be made at the stage of the proceedings in which the district court is considering whether to compel the parties to arbitrate, which is the stage at which Escobar's case finds itself.  At this present arbitration-enforcement stage of a Convention

---

[9] See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 n.19, 105 S. Ct. 3346, 3359 n.19 (1985) (stating in a footnote that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy").  The so-called effective-vindication doctrine "originated as dictum in Mitsubishi Motors," where the Supreme Court actually declined to apply the doctrine. Italian Colors, 570 U.S. at ___, 133 S. Ct. at 2310.  "Subsequent cases have similarly asserted the existence of an 'effective vindication' exception, but have similarly declined to apply it to invalidate the arbitration agreement at issue."  Id. (citations omitted).

15

case, the only affirmative defense that a reviewing court can consider is a defense that demonstrates the arbitration agreement is null and void, inoperative, or incapable of performance, under Article II of the New York Convention. Lindo, 652 F.3d at 1276; cf. Bautista, 396 F.3d at 1301–02.

And a null-and-void challenge to enforcing an arbitration agreement must be grounded in standard breach-of-contract-type defenses—such as fraud, mistake, duress, or waiver—which defenses can be applied neutrally before international tribunals. Lindo, 652 F.3d at 1276–77. Escobar's public-policy defense—the effective-vindication doctrine—is not that type of defense. These traditional breach-of-contract claims do not include public-policy or unconscionability arguments. See id. at 1280–82; Bautista, 396 F.3d at 1302.

In fact, "at the arbitration-enforcement stage, it is generally premature to make findings about how arbitrators will conduct the arbitral process, whether a claim will be heard, or whether the foreign-law remedies will be adequate or inadequate." Lindo, 652 F.3d at 1279.

In this regard, the Supreme Court's decision in Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer is instructive because it involved a contract with a "Governing Law and Arbitration" clause that provided for Japanese law to govern the contract and required any contractual disputes to be resolved through

16

arbitration in Japan.  515 U.S. 528, 531, 115 S. Ct. 2322, 2325 (1995).[10]

Nonetheless, the Supreme Court in Vimar explained: "At this interlocutory stage it is not established what law the arbitrators will apply to [the plaintiff's] claims or that [the plaintiff] will receive diminished protection as a result.  The arbitrators may conclude that [the U.S. statute] applies of its own force or that . . . [the U.S. statute] controls."  Id. at 540, 115 S. Ct. at 2329.[11]  Thus, any claim that an arbitration agreement prospectively waived a party's right to pursue U.S. statutory remedies must be brought at the award-enforcement stage, not at the arbitration-enforcement stage.  Lindo, 652 F.3d at 1282.[12]

---

[10]Although this clause selected both the forum of dispute resolution (arbitration in Japan) and the choice of law (Japanese law), the Vimar Court referred to this provision simply as a "foreign arbitration clause."  515 U.S. at 530, 115 U.S. at 2325.

[11]In Vimar, the party seeking to avoid arbitration argued that the application of Japanese law in arbitration would operate to limit its rights under the Carriage of Goods by Sea Act.  See 515 U.S. at 530, 115 S. Ct. at 2325.  In concluding that the argument was premature at the arbitration-enforcement stage, the Vimar Court did not specify whether it reached that result based on the FAA or the Convention Act.  See generally id. at 539–41, 115 S. Ct. at 2329–30.  Indeed, the Supreme Court in Vimar did not indicate whether the New York Convention even governed the dispute at issue in that case, but merely noted the basic purpose of New York Convention when explaining that American "courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements."  Id. at 538–39, 115 S. Ct. at 2329.  In Lindo, this Court expressly applied Vimar's "wait-and-see principle" to a case governed by the Convention Act.  See Lindo, 652 F.3d at 1268, 1275–76.

[12]In Lindo, the plaintiff seaman sued his employer in Florida state court under the Jones Act for injuries sustained on his employer's cruise ship.  652 F.3d at 1261.  The employer removed the action to federal district court, which granted its motion to compel arbitration pursuant to an arbitration clause in the employment contract.  Id. at 1261–62.  That contract called for the application of Bahamian law, which the plaintiff claimed violated public policy by waiving his Jones Act claims.  Id. at 1262.
    This Court observed that "a statutory Jones Act claim does not affect the strong presumption in favor of enforcement of the choice clauses" in employment contracts.  Id. at 1276.  Affirming the district court's enforcement of arbitration, this Court held that a plaintiff

17

This conclusion accords with holdings by the Second and Fourth Circuits. See JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 167, 182 (2d Cir. 2004) (rejecting as "premature" a party's argument that application of an arbitration clause would prevent the vindication of certain rights under the Sherman Act because the arbitration clause allowed for arbitration in London under English law); Aggarao, 675 F.3d at 373 (holding that a party to an arbitration agreement and attendant choice-of-law clause could not raise a public-policy defense, which was based on the prospective-waiver doctrine, "until the second stage of the arbitration-related court proceedings—the award-enforcement stage").[13]

---

"cannot raise an Article V public policy defense at this initial arbitration-enforcement stage." Id. at 1282. Rather, the plaintiff must wait to raise his public-policy argument until after the arbitrator rules, at which time "the record will show what legal principles were applied and what [the plaintiff] recovered, or did not recover, and why." Id. at 1284.

[13]In non-Convention Act cases that cite Vimar, the Fifth and Ninth Circuits have rejected arguments on the merits that certain contractual clauses, which select a foreign judicial (non-arbitration) forum and provide for the application of foreign law, violate public policy by undermining American statutory rights. See, e.g., Ambraco, Inc. v. Bossclip B.V., 570 F.3d 233, 238 (5th Cir. 2009) (in action to recover for damages to cargo, rejecting a defense to contractual clause—which required the parties to proceed in English courts under English law—because the party seeking to avoid the clause failed to prove that application of English law would violate public policy established by the Carriage of Goods at Sea Act); Fireman's Fund Ins. Co. v. M.V. DSR Atl., 131 F.3d 1336, 1337 (9th Cir. 1997), as amended (Mar. 10, 1998) (in action to recover for damages to cargo, rejecting a defense to a contractual clause—which provided that the contract was governed by Korean law and required contractual disputes to be brought in Korean courts—because application of the clause would "neither lessen[ ] liability under the Carriage of Goods at Sea Act nor violate[ ] public policy").

In those cases, the plaintiffs raised public-policy defenses to the forum-selection and choice-of-law clauses prior to any foreign litigation, rather than when a party sought to enforce a foreign judgment. The defendants in those cases, however, did not raise the threshold issue of whether the plaintiffs' public-policy arguments were premature at that stage.

18

Consistent with <u>Lindo</u>, <u>Vimar</u>, and these sister circuits, we conclude that Escobar's public-policy argument (based on a foreign choice-of-law clause) is likewise premature at this arbitration-enforcement stage.  See <u>Lindo</u>, 652 F.3d at 1280–82.  There will be a subsequent opportunity for review at the award-enforcement stage to ensure that public-policy interests are adequately addressed. See <u>Vimar</u>, 515 U.S. at 539–41, 115 S. Ct. at 2329–30.  But Escobar must wait to raise his public-policy argument until after the arbitrator rules, at which time "the record will show what legal principles were applied" and "what [Escobar] recovered, or did not recover, and why."  <u>Lindo</u>, 652 F.3d at 1284.

## B.    <u>Lindo</u> Is Binding Precedent and Remains Good Law

Escobar recognizes that <u>Lindo</u> dooms his present challenge to Celebration's motion to compel arbitration.  His response is that we should not follow <u>Lindo</u>.  To support that contention, Escobar argues <u>Lindo</u> overlooked an earlier decision in <u>Thomas v. Carnival Corp.</u>, 573 F.3d 1113 (11th Cir. 2009).  Yet as <u>Lindo</u> expressly explained at length, <u>Thomas</u> itself did not follow prior circuit precedent in <u>Bautista</u>.  See <u>Lindo</u>, 652 F.3d at 1277–80 (explaining that "<u>Thomas</u> failed to follow <u>Bautista</u>'s holding").

<u>Bautista</u>, which interpreted the types of defenses available to counter a motion to compel arbitration, held that Article II's "null and void" clause applied only to traditional breach-of-contract defenses, such as fraud or mistake.  See

19

Lindo, 652 F.3d at 1278.  Thomas, which neither cited nor acknowledged Bautista's governing principles, therefore imported an Article V defense into Article II, in contravention of prior Eleventh Circuit precedent.  Id.  Accordingly, as it was required to do under the prior-panel precedent rule, Lindo correctly followed the earlier controlling decision: Bautista.

Indeed, let there be no doubt: To the extent that Thomas and Lindo are arguably at odds, Lindo controls.

Thomas also failed to follow Supreme Court precedent holding that it would be premature at the arbitration-enforcement stage to make a finding that a plaintiff will receive "diminished protection" in arbitration, even where the plaintiff seeks to assert U.S. statutory rights but the arbitration provision states that the claims will be governed by foreign law.  See Vimar, 515 U.S. at 539–41, 115 S. Ct. at 2329–30; see also Lindo, 652 F.3d at 1268–69 (discussing Vimar).

Finally, Escobar contends that Lindo is inconsistent with Supreme Court precedent.  We disagree.  As to the earlier Supreme Court case relied on by Escobar—Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 105 S. Ct. 3346 (1985)—Lindo explained in some detail why Mitsubishi Motors's dicta, which is found in a footnote and is now relied on by Escobar, was not inconsistent with Lindo's holding.  See Lindo, 652 F.3d at 1265–68, 1281–82.

20

Contrary to Escobar's claims, Lindo also is not inconsistent with the later case Italian Colors, where the Supreme Court acknowledged the effective-vindication doctrine. See 570 U.S. at ___, 133 S. Ct. at 2310. In fact, the Italian Colors Court noted that the effective-vindication doctrine originated as dictum in Mitsubishi Motors (where it had not been applied to invalidate the arbitration agreement at issue there) and was discussed in two other Supreme Court cases (but again not applied to invalidate the arbitration agreements there). See id. Likewise, notwithstanding its mention of this doctrine (on which Escobar seeks to rely), the Supreme Court in Italian Colors gave no further guidance on the doctrine's application that would alter our previous understanding of it. See generally id. at ___, 133 S. Ct. at 2310–12. Importantly, the opinion in Italian Colors likewise declined to apply that doctrine, or any other rationale, to invalidate the arbitration agreement at issue. Id. at ___, 133 S. Ct. at 2310–11. In short, nothing in Lindo conflicts with either Italian Colors or Mitsubishi Motors.

## VIII. COST-SPLITTING CLAUSE

Escobar's last affirmative defense at this arbitration-enforcement stage is that the cost-splitting clause renders his arbitration agreement "null and void." That clause states that "[a]lthough [Celebration] shall bear the initial cost of the arbitration, each [party] shall be responsible for one half of the cost of arbitration."

21

Escobar asserts that requiring him to pay for half the arbitration cost effectively denies him access to the forum because he is indigent.[14]

## A.    Prohibitive-Cost Defense

Escobar points out that the Supreme Court has observed, albeit in dicta, that the effective-vindication doctrine "would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable." Italian Colors, 570 U.S. at ___, 133 S. Ct. at 2310–11; see also Green Tree Fin. Corp.–Ala. v. Randolph, 531 U.S. 79, 90, 121 S. Ct. 513, 522 (2009) ("It may well be that the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum.").

The "party seek[ing] to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive . . . bears the burden of showing the likelihood of incurring such costs." Green Tree, 531 U.S. at 92, 121 S. Ct. at 522. The mere existence of a cost-splitting clause in an arbitration agreement does not satisfy a plaintiff's burden to prove the likelihood of prohibitive costs. See Musnick v. King Motor Co. of Fort Lauderdale, 325 F.3d 1255, 1259 (11th Cir. 2003). Rather, a party invoking the effective-vindication doctrine because the cost

---

[14]To the extent that Escobar contends that the cost of arbitration renders his claims not worth pursuing, we must reject that argument. As the Supreme Court has stated, "the fact that [arbitrating] is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the right to pursue that remedy." Italian Colors, 570 U.S. at ___, 133 S. Ct. at 2311.

22

of arbitration is prohibitively expensive must present evidence of two things: (1) "the amount of the fees he is likely to incur;" and (2) "his inability to pay those fees." Id. at 1260. Speculative fear of high fees is insufficient. Id.

Notably, the Supreme Court did not apply the effective-vindication doctrine in Italian Colors or Green Tree. And we can find no court that has applied it in the context of a New York Convention case.[15]

## B.    Escobar's Cost-Splitting Claim

In any event, Escobar's cost-splitting claim fails for several reasons. First, to the extent Escobar could make such a claim in a New York Convention case, it is premature for Escobar to do so at this arbitration-enforcement stage. The cost-splitting clause states that Celebration will pay "the initial cost of arbitration." At oral argument, Celebration's counsel conceded that Celebration must pay the $3,000 fee to start the arbitration proceedings.[16] Thus, Escobar has access to the forum.

---

[15]Neither Bautista nor Lindo involved a claim that a cost-splitting clause effectively prevented a plaintiff from accessing the arbitral forum. In Bautista, the plaintiffs alleged that they "were put in a difficult 'take it or leave it' situation when presented with the terms of employment" and thus "state-law principles of unconscionability render[ed] the resulting agreements unconscionable." 396 F.3d at 1302. In Lindo, the plaintiff "contended that the arbitration provision should not be enforced due to the economic hardship [the plaintiff] would incur because his Contract was unclear regarding the extent to which he must pay arbitration costs." 652 F.3d at 1262.

[16]Counsel for Celebration represented to the Court that it was not "in dispute" that the "initial cost [is] to open the doors to begin the arbitration and begin the proceedings."

Second, we do not read this clause to limit Celebration's financial responsibility for the arbitration to that one fee. The most reasonable reading of the clause is that Celebration will initially pay for the cost of the arbitration itself, and then, after the arbitrator's decision, Escobar ultimately will be responsible for his one-half share. Regardless, the precise application of the cost-splitting clause is an issue properly for the arbitrator to consider, and Escobar has not shown that he "is likely to incur" any costs due prior to the arbitrator's decision. See Musnick, 325 F.3d at 1260.

Third, Escobar asserts that his half of the arbitrator's fees "could exceed $20,000 . . . for a 3-day arbitration hearing," but how Escobar came up with the $20,000 figure remains a mystery; he cites to no evidence or authority to support that claim.[17]

In sum, based on the clause language and his own filings, Escobar has wholly failed to establish that he would be denied access to the forum. See id. at 1259–60. Accordingly, the appropriate time for Escobar to raise any argument relating to the payment of fees would be at the award-enforcement stage, if and when Celebration attempts to collect arbitral costs from him.[18]

---

[17]At oral argument, Escobar's counsel stated that the number was based on counsel's previous experience in an arbitration arising out of a seaman's claims against a cruise line. This bare assertion, with no support in the record, is clearly insufficient to meet Escobar's burden.

[18]Escobar also argues that the enforcement of foreign-law clauses in seamen's arbitration agreements greatly compromises the safety of American cruise passengers and violates public

24

## IX. DENIAL OF ESCOBAR'S MOTION TO REMAND

Escobar's final claim is that his case was improperly removed from state court. Escobar's argument ignores the express terms of the Convention Act.

As a general matter, a defendant may not remove a Jones Act claim brought in state court, even if the parties are diverse. Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 455, 121 S. Ct. 993, 1004 (2001) (citing 28 U.S.C. § 1445(a)).[19]

Section 205 of the Convention Act, however, creates an exception to this general rule and provides for the removal of cases governed by the New York Convention. See 9 U.S.C. § 205. Specifically, § 205 states that, "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the [New York] Convention," a defendant may "remove such action or proceeding to the district court of the United States." Id. (emphasis added). Thus, the Convention Act permits a defendant to remove a case relating to an arbitration agreement covered by the New York Convention. See Bautista, 396 F.3d at 1294.

---

policy. Escobar, however, failed to raise this argument in the district court. Regardless, this public-policy argument would also be premature. See Lindo, 652 F.3d at 1280–82; see also New York Convention, art. V(2)(b).

[19]Although § 1445(a) provides that certain civil actions in state court against a railroad "may not be removed to any district court of the United States," 28 U.S.C. § 1445(a), the Supreme Court in Lewis noted that the Jones Act incorporated § 1445(a) by reference. Lewis, 531 U.S. at 455, 121 S. Ct. at 1004–05; see also 46 U.S.C. § 30104 (stating that the "[l]aws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action" brought under the Jones Act).

25

Here, Escobar raised claims relating to an injury suffered during his employment with Celebration.  Escobar's employment contract required arbitration of all claims "arising out of or in connection with" Escobar's employment.  The subject matter of Escobar's action in state court therefore related to his arbitration agreement.  Furthermore, as explained supra, Part V, Escobar's arbitration agreement met the four jurisdictional requirements and is governed by the New York Convention.

Accordingly, Escobar's Jones Act claims brought in state court were subject to removal, pursuant to § 205, see Bautista, 396 F.3d at 1294, and the district court did not err in denying Escobar's motion to remand.

## XI. CONCLUSION

For the all the reasons stated above, the district court properly (1) granted Celebration's motion to compel arbitration and dismiss the complaint and (2) denied Escobar's motion to remand the case to state court.[20]

**AFFIRMED.**

---

[20]Because all of Escobar's affirmative defenses to his arbitration agreement are premature at this arbitration-enforcement stage, we need not consider the applicability of the severance clause in his employment contract.